<br>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCINE LEONARD,<br><br>   Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN,<br><br>   Defendant. | Case No.  15-cv-03536-SK<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Regarding Docket Nos. 15-17 |

United States District Court
Northern District of California

        Now before the Court is the motion for summary judgment filed by Plaintiff Francine

Leonard and the cross-motion for summary judgment filed by the Commissioner of Social

Security ("Commissioner").  Pursuant to Civil Local Rule 16-5, the motions have been submitted

on the papers without oral argument.  Having carefully reviewed the administrative record,

considered the parties' papers, the relevant legal authority, and good cause appearing, the Court

hereby GRANTS Ms. Leonard's motion for summary judgment and REMANDS this action for

further proceedings.  The Court further DENIES the Commissioner's cross-motion for summary

judgment.

**A.      BACKGROUND**

        **1.      Factual Background.**

        At the time Ms. Leonard filed for disability benefits on January 26, 2012, she was 53 years

old and had allegedly been unable to work since July 28, 2009.  *See* the Administrative Record

("AR") at 58.  From 1977 to 2009, Ms. Leonard was employed as a court reporter for the State of

California. AR 53. In 2009, Ms. Leonard suffered from a number of impairments, some

musculoskeletal in nature, such as cervical strain and sprain bulging spinal discs, and other

physical maladies.  In addition, she suffered from depression and stress-related impairments.

//

1

### a. Physical Impairment.

2

#### i. Musculoskeletal Complaints

3    Ms. Leonard's history of spine-related pain predates the alleged onset date in June 2009.

4 In August 2003, Ms. Leonard was diagnosed with lumber spine musculoligamentous sprain/strain

5 with multilevel spondylosis and two millimeter disc bulges at the L4-L5 and L5-S1 levels, as seen

6 in an MRI scan.  AR 1456.

7    On February 19, 2008, Ms. Leonard was diagnosed with a cervical musculoligamentous

8 sprain, spondylosis, and multilevel disc protrusions in her back by her workers' compensation

9 treating physician, Philip Sobol, M.D.  AR 334, 1304.  Ms. Leonard saw Dr. Sobol every one or

10 two months from December 2007 through August 2009.  AR 1300-1344.  During most of that

11 time Ms. Leonard had work restrictions in place as recommended by Dr. Sobol and Dr. Steven

12 Brourman.

13    In April 2008, Dr. Sobol released Ms. Leonard back to work with the following

14 restrictions: no lifting over fifteen pounds, no use of a manual hand stamp or of a computer

15 keyboard, and no repetitive forceful gripping or squeezing.  AR 1304.  On July 1, 2008, Dr. Sobol

16 again examined Ms. Leonard.  Dr. Sobol found tender musculature, active trigger points, reduced

17 range of motion of the cervical and lumbar spine, and positive straight leg raising test on left side

18 with radicular complaints.  AR 1317.  Dr. Sobol diagnosed Ms. Leonard with cervical spine

19 musculoligamentous, multilevel decreased disc height with desiccation C4-5 through C6-7 and

20 loss of cervical lordosis, posterior disc bulging on the left greater than the right, resulting in mild

21 neuroforaminal stenoisis, left knee patellofemoral arthralgia, lumbar spine sprain with left lower

22 extremity radiculitis, bilateral sacroiliac joint sprain, and spondylosis of L1through L4 with disc

23 bulge at L4-S1.  AR 1317.  The records stated:  "The patient is performing her job duties with

24 work restrictions provided by the Agreed Medical Examiner, Dr. Brourman, M.D." *Id.*

25    On August 4, 2008, Dr. Brourman evaluated Ms. Leonard.  AR 325, *et seq.*  Dr. Brourman

26 had previously seen Ms. Leonard in 2003 and 2007 for low back pain, neck pain, right middle

27 finger pain, bilateral shoulder pain and occasional knee pain.  AR 328-29.  On examination in

28 2008, Dr. Brourman found that muscle spasm and tenderness along the cervical spine and

*United States District Court*
*Northern District of California*

2

United States District Court
Northern District of California

1    tenderness along the lower lumbar spine.  AR 333.  Dr. Brourman diagnosed cervical degenerative

2    disc disease with left paracentral disc protrusion at C4-5 of 4 millimeters and another on the right

3    side at C5-C6.  AR 334.  He also diagnosed depression, a history of a right knee injury and strain

4    to the right wrist and middle finger.  AR 334-35.

5         On May 7, 2009, Dr. Sobol restricted Ms. Leonard's job duties to preclude lifting over

6    fifteen pounds, repetitive bending or stooping, prolonged sitting, an allowance of fifteen minutes

7    to transport her work cart, and a five minute stretching break every hour.  AR 1340.  On June 11,

8    2009, the restrictions were changed to allow for lifting of ten pounds or less and to require a

9    fifteen minute break each hour.  AR 1342.  On December 10, 2009, the restrictions were again

10   modified to include no prolonged posturing of the head or neck.  AR 1345.

11        On January 24, 2012, Dr. Sobol evaluated Ms. Leonard and found decreased range of

12   motion in the cervical and lumbar spine.  AR 1365-66.  His final diagnosis included four

13   millimeter disc bulges at C4-C5 and C5-C6, a two millimeter disc bulge at C6-C7 with central

14   canal stenoissi and neuroforaminal stenosis; multilevel spondylosis with two millimeter disc

15   bulges at L4-L5 and L5-S1 in the lumbar spine; temporomandibular joint dysfunction, bruxism,

16   xerostomia; a sleep disorder; and bilateral shoulder, right wrist/hand, and bilateral knee pain.  AR

17   1366.  He noted that Ms. Leonard experienced flare-ups of orthopedic pain when performing

18   activities of daily living.  AR 1368.  As to Ms. Leonard's disability status, he stated that her

19   "orthopedic condition remains permanent and stationary as recommended by the Agreed Medical

20   Examiner, Dr. Brourman." *Id.*

21        Dr. Rose Lewis performed a consultative exam of Ms. Leonard on July 23, 2012.  AR

22   1371.  Ms. Leonard weighed 232 pounds and was 5'5" tall.  AR 1372.  Dr. Lewis diagnosed

23   degenerative arthritis, cervical degenerative disease with radiculopathy, hypothyroidism, acid

24   reflux and hypertension.  AR 1373.  Dr. Lewis concluded that Ms. Leonard was able to carry up to

25   20 pounds on occasion and 10 pounds frequently due to the cervical degenerative disc disease with

26   radiculopathy.  Dr. Lewis assessed Ms. Leonard as being able to stand and walk up to six hours,

27   climb and balance frequently, but stoop, kneel, crouch and crawl only occasionally because of the

28   decreased range of motion in her back and shoulders.  *Id.*  As to Ms. Leonard's deportment, Dr.

3

1    Lewis stated that she is "an obese woman complaining of back pain and will only sit down after

2    demanding a pillow propped behind her back" but was able to sit on the was examination table for

3    vitals and could get on and off without difficulty, and could sit in a padded chair comfortably.  *Id.*

4    Dr. Lewis referred to Ms. Leonard as "a (sic) extremely poor historian."  AR 1371.

5          On October 24, 2013, Ms. Leonard's treating physician, Dr. Timothy Hsieh, evaluated Ms.

6    Leonard's abilities as they would have been on or before June 30, 2012.  AR 1600.  Dr. Hsieh

7    determined that Ms. Leonard's physical capacity was limited, stating that she cannot use her hands

8    for simple grasping, pushing and pulling, fine manipulation, or repetitive motion tasks.  *Id.*  He

9    also indicated that she was not able to climb, balance, stoop, kneel, crouch, crawl, reach above

10   shoulder level, and that she was not able to lift over 5 pounds comfortably, and that she could only

11   lift 0-5 pounds occasionally.  AR 1602.  Dr. Hsieh also found that in light of Ms. Leonard's

12   thyroid dysfunction and Graves' disease, Ms. Leonard suffered disabling fatigue and headaches

13   that prevented her from working full-time in even a sedentary position.  AR 1602-03.  Finally, Dr.

14   Hsieh determined that the physical pain from which Ms. Leonard suffered was so severe that it

15   "precludes attention and concentration for even simple, non-skilled work tasks."  AR 1604.

16                          ii.   Other Physical Complaints

17         As described by Dr. Hsieh in 2013, Ms. Leonard suffered not only from chronic pain, but

18   also from thyroid dysfunctions that left her fatigued and unable to work full time.  She has been

19   diagnosed with other physical maladies.  She was diagnosed with hypertension in 2001.  AR 416.

20   In 2003, she was diagnosed with ulcerative colitis.  AR 418.  In 2004, she was diagnosed with

21   diabetes.  AR 416.

22         In March 2008, Ms. Leonard saw Dr. Mathias Schar as for urinary incontinence resulting

23   from very large fibroids of the uterus.  AR 756.  She was diagnosed with hypertension and

24   leiomyoma of the uterus.  *Id.*  On June 12, 2009, Ms. Leonard was evaluated by Charles Dobeck,

25   DDS, for trigger point pain to her face.  AR 1379.  On February 18, 2011, she was seen for

26   hypertension and a thyroid goiter.  AR 1174.  Ms. Leonard was hospitalized for five days in

27   December 2011 for fever, hyperthyroidism with weight loss, diarrhea, shortness of breath and

28   borderline personality disorder.  AR 1285.  On December 31, 2011, Ms. Leonard was seen for

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   persistent fevers associated with uterine fibroids and hyperthyroidism.  AR 1261.  On January 23,

2   2012, she was seen for increased appetite, heart palpitations, fatigue and forgetfulness.  AR 1271.

3                     **b.  Mental Impairment.**

4          Ms. Leonard's medical records reflect that as far back as 1996-97, Ms. Leonard has been

5   under psychiatric care for major depression and panic disorder.  AR 416.  In 2001, Ms. Leonard

6   was convinced that one of her coworkers had attempted to poison her.  AR 476-77.  In 2003, Ms.

7   Leonard was again diagnosed with panic disorder.  AR 459.  In 2004, she was diagnosed with

8   major recurrent moderate depression.  *Id.*

9          In 2006, Ms. Leonard attempted suicide by inhalation of car exhaust and as a result, was

10  hospitalized for five days at the county hospital.  AR 477.  A report from September 2007 by Dr.

11  Revels Cayton, states that she had "difficulties with coworkers and supervisors that were regular,

12  protracted and unremitting" and that she had "an endless accounting of things that have been done

13  to injure her…."  AR 419.  Dr. Cayton noted that there are studies connecting autoimmune

14  disorders, such as Ms. Leonard's ulcerative colitis and Graves' disease, and psychiatric distress

15  from depression and anxiety.  AR 420-21.

16         On May 22, 2008, Ms. Leonard saw Dr. Norman Hartstein after she fainted at work, and

17  Ms. Leonard told Dr. Hartstein that she felt "angry, tormented, terror towards supervisor."  AR

18  484.  Ms. Leonard said that she was suspended from work in 2007 and described her "power

19  struggle" with another Kaiser doctor.  AR 485.  Dr. Hartstein noted that Ms. Leonard's symptoms

20  included "anxiety, fainting, grief, sadness, tired, sleeping and staying in bed on weekends, slower

21  pace, psychomotor retardation, unhappy."  *Id.*  Dr. Hartstein also noted that she experienced high

22  levels of stress at work, agitation, fatigue, feelings of worthlessness, anhedonia, difficulty

23  sleeping, and inability to pay attention.  AR 485-86.  Dr. Hartstein described her at times as

24  sounding "self-referential and paranoid."  AR 487.  The records from that date also indicated:

25  "Patient stated does not drive due to being distracted and has history of crashing car due to

26  distractibility and fainting."  AR 716.

27         On August 7, 2008, Dr. Sobol referred Ms. Leonard to psychiatry for anxiety, depression

28  and insomnia.  AR 1320.  On October 10, 2008, Ms. Leonard told Dr. Sobol that she had been

United States District Court
Northern District of California

1    suspended from her job for 60 days.  AR 1325.

2        On July 31, 2009, Ms. Leonard's psychotherapist noted that Ms. Leonard complained that

3    her employer tried to terminate her three times, citing Ms. Leonard's inability to work well with

4    co-workers.  AR 709.  Ms. Leonard complained of moderate to severe panic attacks, moderately

5    impaired concentration, and moderate work maladjustment problems.  AR 712.

6        The August 10, 2009 report of psychiatrist Dr. James Parks noted that Ms. Leonard

7    suffered from chronic pain syndrome, panic disorder, and depression (major, recurrent, moderate).

8    AR 956-57.  He also noted that she suffered from malaise, fatigue, depression, nervous/anxious

9    and memory loss.  AR 958.  Dr. Parks noted that Ms. Leonard suffered from side-effects of Paxil

10   (Paroxetine Hci), Wellbutrin (Bupropion Hci), including nausea and/or vomiting.  AR 960.  She

11   also suffered from side effects from Prozac.  *Id.*   She was diagnosed with panic disorder,

12   borderline personality disorder, palpitations, chronic pain syndrome, and depression.  *Id.*

13       On August 26, 2009, Ms. Leonard met with a new therapist for the first time, and when the

14   therapist asked Ms. Leonard if she had been to the clinic before, Ms. Leonard responded that she

15   knew her rights and the question was a HIPAA violation.  AR 694.  Ms. Leonard remained angry

16   and would not speak to the therapist and instead Ms. Leonard spoke on her cell phone and left the

17   room.  *Id.*   Ms. Leonard ended the appointment with the comment: "I don't want anything to do

18   with you."  *Id.*   The therapist's observations state that Ms. Leonard was "guarded, hostile,

19   confused, argumentative, agitated, paranoid and histrionic, angry, anxious, depressed and

20   irritable."  AR 695.

21       On August 27, 2009, Ms. Leonard's new therapist was unable to redirect Ms. Leonard

22   from the conflict of the day before.  AR 689.  The therapist described Ms. Leonard's exchanges as

23   "agitated and histrionic, anxious, depressed, expansive, and grandiose."  Also, Ms. Leonard

24   "exhibited paranoid ideation and was difficult to redirect" and "her thoughts were tangential and

25   she was highly verbose."  *Id*.

26       On September 2, 2009, Ms. Leonard was again very upset.  AR 684.  Her therapist stated:

27   "observations of patient's interpersonal and or interverbal exchanges: paranoid, anxious,

28   depressed, euphoric, frightened."  *Id.*   Ms. Leonard's overall impairment was listed as severe.  *Id.*

United States District Court
Northern District of California

1   On September 16, 2009, Ms. Leonard left a group therapy session because of a severe anxiety.

2   AR 665.  The therapist determined that Ms. Leonard was "well known" to the mental health crisis

3   hotline.  *Id.*    The Administrative Record includes reports from regular psychotherapy sessions

4   continuing into 2011.  At times, slight improvement was noted.  *See e.g.,* AR 1025, 1091, 1121,

5   1135, 1217.  However, much of the time, the reports show lack of progress.  In May 2010, Ms.

6   Leonard expressed that she wanted to transfer therapists because she was not allowed to explore

7   her feelings; her therapist noted that she had "regressed." AR 570.  In June 2010, Ms. Leonard

8   dropped out of a women's empowerment program after misunderstandings with the group leaders.

9   AR 1153.  In July 2010, her therapist noted Ms. Leonard's increasingly depressed mood.  AR

10  1160.  In May 2011, Ms. Leonard reported frequent calls to the hotline with an "intense feeling of

11  wanting to die." AR 545.  In June 2011, she reported panic attacks and felt alone; she was

12  diagnosed with dysthymia.  AR 1203.

13      In November 2011, Dr. Christina Shaw examined Ms. Leonard, and Dr. Shaw noted that,

14  in addition to an abnormal loss of weight, Ms. Leonard was depressed and unstable.  Dr. Shaw

15  offered Ms. Leonard inpatient psychiatric care, which Ms. Leonard declined.  Dr. Shaw described

16  Ms. Leonard as "very sick psych-wise, passive SI, chronic pain." AR 1231.

17      **2.      Procedural Background.**

18      Ms. Leonard filed for disability benefits on January 26, 2012, alleging that she had been

19  disabled since July 28, 2009.  The Social Security Administration denied Ms. Leonard's claim on

20  August 15, 2012 (AR 57-69) and subsequently affirmed the denial on reconsideration.  AR 70-85.

21  Ms. Leonard requested a hearing, which was held on October 28, 2013 by Administrative Law

22  Judge Mary P. Parnow ("ALJ").

23      **a.   The Administrative Hearing.**

24      Ms. Leonard, her non-attorney representative, and a vocational expert appeared before the

25  ALJ on October 28, 2013.  AR at 35-56.  Ms. Leonard's representative first met with the ALJ

26  without Ms. Leonard stating: "This claimant is very difficult in many ways and I have to be very

27  careful not to set her off.  I don't know if you've read through the complete record or not, but her

28  problems seems to be more psychological or as psychological as physical." AR at 35.  The ALJ

United States District Court
Northern District of California

1    then tabled the discussion as to Ms. Leonard's psychological condition, and the ALJ noted that she

2    had another hearing and not a lot of time.  AR at 36.

3          Subsequently, Ms. Leonard testified that she suffered from stress and had trouble

4    concentrating at work.  AR at 39.  She described pain in her shoulders and degenerated discs in the

5    neck.  AR at 40.  Ms. Leonard explained her history of repetitive strain which prevented her from

6    performing her duties as a court reporter, given that she could not work for longer than 30-minute

7    intervals.  *Id.*  Ms. Leonard testified that she suffered from ulcerative colitis, thyroid problems,

8    Graves' Disease, tendonitis, nerve problems in her hand and elbows, severe TMJ in her jaw, low

9    grade headaches all the time due to jaw and neck pain, and that her pain had increased over the

10   past five years.  AR at 41-43.  Ms. Leonard complained of sleep problems caused by neck pain

11   and stated that she required at least two forty-minute naps per day.  AR at 44.  Ms. Leonard also

12   stated that she was unable to drive more than short distances due to neck and arm pain and her

13   lack of requisite alertness and ability to concentrate.  *Id.*  Further, Ms. Leonard stated that she was

14   unable to sit for longer than 30 – 40 minutes or stand for longer than 15 minutes.  AR at 45.

15         Ms. Leonard testified that she did not take medication because she developed acid reflux

16   from Relafen and Tylenol with Codeine.  AR at 51.  She was concerned about liver or kidney

17   problems due to the long term use of such medication, as well as her history of irritable bowel

18   syndrome and ulcerative colitis, preferring "natural methods" over medication.  AR at 51.  The

19   ALJ cut off Ms. Leonard from further discussion about her treatment because the ALJ was

20   "running out of time."   AR at 52.  The ALJ did not delve into the psychological aspects of Ms.

21   Leonard's condition.

22         The ALJ concluded the hearing with questioning of the vocational expert.  The vocational

23   expert testified that Ms. Leonard's work history consisted of being a court reporter from 1977 to

24   2009, as light sedentary work with an SVP of 6.  AR at 53.  The ALJ then asked two hypothetical

25   questions of the expert.  The first hypothetical focused on an individual Ms. Leonard's age,

26   education and set of skills who can: stand and walk up to six hours in an eight hour day; sit up to

27   six hours in an eight hour day; lift and carry up to twenty pounds occasionally and ten pounds

28   frequently; climb stairs and ramps frequently, but never ladders, ropes and scaffolds; frequently

1    balance, occasionally stoop and kneel, crouch and crawl; frequently handle, finger, feel;

2    occasionally reach overhead and frequently reach in other directions.   This hypothetical was

3    consistent with the limitations contained in the report of Dr. Lewis.  The vocational expert testified

4    that this person could perform Ms. Leonard's past work.  AR 54-55.  The second hypothetical was

5    focused on the same individual, but with the additional restrictions of being able to reach in all

6    directions, keyboard, and perform stenographic work on occasion only.  The vocational expert

7    testified that this person could not perform Ms. Leonard's prior occupation and that there were no

8    transferable skills because they all involve keyboarding.  AR at 55-56.

9            The ALJ issued a determination on December 17, 2013, finding that Ms. Leonard was not

10   disabled.  The Social Security Administration Appeal Council denied Ms. Leonard's request for

11   review of the on June 26, 2015.  AR at 1.

12                         **b.  The ALJ's Findings.**

13           The ALJ found that Ms. Leonard was insured through June 30, 2012 and that she did not

14   engage in substantial gainful activity between her date of onset and the date last insured.  AR at

15   91.  The ALJ also found that through the date she was last insured, Ms. Leonard had severe

16   impairments of degenerative disc disease of the cervical spine with radiculopathy and degenerative

17   arthritis, and that Ms. Leonard had medically determinable impairments of hypertension, acid

18   reflux, hypothyroidism, temporomandibular joint disorder, and sleep disorder.  *Id.*  However, the

19   ALJ found that these conditions were not severe enough to limit Ms. Leonard's ability to work

20   because the medical records indicated that these impairments were stable with no positive findings

21   to show that they significantly limited Ms. Leonard's ability to work.  AR at 92-93.

22           While the ALJ found that Ms. Leonard suffered from depression, anxiety, irritability, and

23   frustration, and acknowledged that Ms. Leonard sought treatment for mental health conditions, the

24   ALJ found that these conditions resulted in mild restrictions in activities of daily living, mild

25   limitations in social functioning, mild limitations in maintaining concentration, persistence and

26   pace, and that Ms. Leonard experienced no episodes of decompensation of extended duration.  AR

27   at 92-94.  Therefore, the ALJ denied a request for a psychiatric consultative examination because

28   that examination would not establish her condition on or before June 2012, the date last insured.

United States District Court
Northern District of California

9

1    AR at 94.

2         The ALJ found that Ms. Leonard had residual functional capacity to perform light work,

3    with: frequent handling and fingering; no climbing of ladders, ropes, or scaffolds; frequent

4    reaching in all directions with both arms; and only occasional overhead reaching with both arms.

5    AR at 94.  Based on this residual functional capacity assessment and the testimony of the

6    vocational expert, the ALJ found that Ms. Leonard could perform her past relevant work as a court

7    reporter, and therefore was not disabled.  AR at 97.

8                    **c.   The Motions for Summary Judgment.**

9         Ms. Leonard filed this action on July 31, 2015 pursuant to 42 U.S.C. § 405(g).  Dkt. No. 1.

10   Both parties subsequently filed motions for summary judgment.  Dkt. Nos. 15 and 16.  The parties

11   have filed cross-motions for summary judgment pursuant to Local Rule 16-5.  (Dkt Nos. 15 and

12   16.)  This action was assigned to the undersigned magistrate judge, and the parties have consented

13   to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

14        In her motion for summary judgment, Ms. Leonard asserts that the ALJ failed to properly:

15   (1) assess her mental impairments as severe; (2) provide clear and convincing reasons for

16   discrediting Ms. Leonard's credibility; (3) provide legitimate reasons for rejecting the opinions of

17   the treating and examining medical services; and (4) obtain expert medical testimony or a

18   consultative examination.  In Defendant's motion, the Commissioner argues that the ALJ

19   permissibly: (1) evaluated the evidence regarding Ms. Leonard's mental health; (2) declined to

20   order a mental health expert in light of the evidence; and (3) properly evaluated both the

21   credibility of Ms. Leonard's testimony, as well as the medical evidence presented.

22   **B.    ANALYSIS**

23        **1.   Legal Standard of Review**

24        The district court has authority to review the Commissioner's final decision under the

25   substantial evidence standard.  42 U.S.C. § 405(g); *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035

26   (9th Cir. 2007).   "Substantial evidence" is defined as "more than a mere scintilla but less than a

27   preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

28   support a conclusion."  *Id.*  (citing *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir.

United States District Court
Northern District of California

10

1   2006)).  In determining whether the Commissioner's findings are supported by substantial

2   evidence, a district court must consider the administrative record as a whole, considering "both the

3   evidence that supports and the evidence that detracts from the Commissioner's conclusion."

4   *Reddick v. Chater,* 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's conclusion is upheld

5   where the evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart,* 400

6   F.3d 676, 679 (9th Cir. 2005).  If the Court identifies defects in the administrative proceeding or

7   the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of

8   benefits.  *Garrison v. Colvin,* 759 F.3d 995, 1019-21 (9th Cir. 2014).

9               **2.      Determination of Disability.**

10          Disability insurance benefits are available under the Social Security Act when an eligible

11  claimant is unable to "engage in any substantial gainful activity by reason of any medically

12  determinable physical or mental impairment …which has lasted or can be expected to last for a

13  continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled

14  if his physical and mental impairments are of such severity that he is not only unable to do his

15  previous work, but also "cannot, considering his age, education and work experience, engage in

16  any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

17  423(d)(2)(A).  The burden of establishing the disability is the claimant's.  *Gomez v. Chater,* 74

18  F.3d 967, 970 (9th Cir. 1996).

19               **a.   The Five Step Sequential Evaluation**

20          To determine whether a claimant is disabled, an ALJ is required to employ a five-step

21  sequential analysis, examining: (1) whether the claimant is "doing substantial activity"; (2)

22  whether the claimant has a "severe medically determinable physical or mental impairment" or

23  combination of impairments that has lasted for more than twelve months; (3) whether the

24  impairment "meets or equals" one of the listings in the regulations; (4) whether, given the

25  claimant's residual functional capacity ("RFC"), the claimant can still do her "past relevant work";

26  and (5) whether the claimant "can make an adjustment to other work."  *Molina v. Astrue,* 674 F.3d

27  1104, 1110 (9th Cir. 2012); *see* C.F.R. §§ 404.1520(a), 416.920(a).  The claimant bears the

28  burden of proof at steps one through four; the burden then shifts to the ALJ at the fifth and final

United States District Court
Northern District of California

1   step. *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999).

2   Where a claimant alleges a mental impairment that prevents a claimant from working, the

3   Social Security Administration has supplemented the five-step sequential evaluation process to

4   assist the ALJ in determining the severity of the mental impairment. *Xie v. Colvin*, 2015 U.S.

5   Dist. LEXIS 125251, at *34 (N.D. Cal. Sept. 18*,* 2015).  An inquiry is conducted wherein the

6   "claimant's pertinent systems, signs, and laboratory findings to determine whether the claimant

7   has a medically determinable mental impairment."  *Id.* (citing 20 C.F.R. § 404.1520a(a).)  The

8   ALJ "must consider all relevant and available clinical signs and laboratory findings, the effects of

9   the claimant's symptoms, how the claimant's functioning may be affected by factors including but

10   not limited to chronic mental disorders, structured settings, medication and other treatment."  *Id.* at

11   *34-35; 20 C.F.R. § 404.1520a(c)(1).  Thereafter, the ALJ determines the degree of claimant's

12   functional limitations given the impairments.  *Id.;* 20 C.F.R. § 1520a(c)(2).  This is different than

13   a residual functional capacity assessment, which is a more detailed assessment at Steps Four and

14   Five of the sequential evaluation process.  Rather, it is a component of analyzing the severity of

15   mental impairments at Steps Two and Three.  *Id.* (citing SSR 96-8p, 1996 SSR LEXIS 5.)  While

16   performing the mental residual functional capacity assessment at Steps Four and Five, the ALJ

17   must address the various functions contained in the broad categories found in Paragraph B of the

18   mental disorders listed in 12.00 of the Listing of Impairments (the "Paragraph B Criteria").  *Id.;* 20

19   C.F.R.§§ 404.1520a(c)(3), 404.1520(d).

20          **b.   The ALJ's Opinion Regarding Mental Disability Is Not Supported by
            Substantial Evidence.**

21

22   The ALJ found that Ms. Leonard reported that she was depressed, anxious, irritable and

23   frustrated; that she suffered from poor concentration, focus and memory; and that there were

24   findings of psychomotor retardation, anhedonia, blunted affect, slow speech and anxiety disorder.

25   Nevertheless, the ALJ concluded that Ms. Leonard did not have a severe mental impairment

26   appear that would significantly limit Ms. Leonard's ability to work for a period of twelve months

27   or more.   AR 93.  The ALJ claims that her findings are based on her evaluation of the four broad

28   functional areas in the Paragraph B Criteria.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The first functional area is "activities of daily living."  The ALJ found that Ms. Leonard

2    has only a minor limitation, given that Ms. Leonard was able to perform some household chores,

3    drive short distances, use public transportation and to go shopping once a week. *Id.*  The second

4    functional area is "social functioning," for which the ALJ found only a minor limitation, given that

5    Ms. Leonard was able to patronize an open air market every few weeks and attended a community

6    support group once a week.  *Id.*  The third functional area is "concentration, persistence and pace."

7    Again, the ALJ found that Ms. Leonard had only a minor limitation as "no significant deficits in

8    this area have been noted on mental status examinations performed at Kaiser Hospital since 2008."

9    *Id.*  The fourth functional area is episodes of decompensation.  The ALJ found that Ms. Leonard

10   had experienced no episodes of decompensation which have been of extended duration.  *Id.*

11   In her consideration of the Paragraph B Criteria, the ALJ relied only upon three reports of

12   Dr. Parks and in doing so, disregarded the many reports of treating clinicians at Kaiser.  As noted,

13   above, there is an abundance of information about Ms. Leonard's lack of social functioning, from

14   conflicts with co-workers to conflicts with the very therapists who were attempting to treat her.

15   Her behavior had been characterized as paranoid on multiple occasions, in addition to fatigued,

16   depressed and anxious.  It is troubling that the ALJ dismissed the numerous reports of therapists

17   written over the course of more than a year with the statement that Ms. Leonard "received mental

18   health treatment for several years with some fluctuations in severity of her symptoms, her

19   symptoms [can] generally be described as stable."[1]  AR 93.

20   Further, the ALJ disregarded the opinion of Dr. Shaw that Ms. Leonard was "very

21   unstable" and that she was "very sick psych-wise."  The rationale used by the ALJ was that Dr.

22   Shaw's finding was not replicated by doctors at Kaiser.  Again, there is substantial evidence to the

23   contrary.  Likewise, there is considerable evidence that Ms. Leonard suffered from episodes of

24   decompensation and that Ms. Leonard suffered from poor concentration, e.g., the report of Dr.

25   Hsieh.  AR 1604.

26

27   _____

28   [1] The Court agrees with Ms. Leonard's position that the ALJ's reliance on the word
     "stable" is misplaced.  "Stable" denotes that a "symptom or condition has not gotten worse" or
     improved.  (Dkt. No. 17 at 2, ft. nt. 1.)

1      The ALJ used Ms. Leonard's unwillingness to use psychotropic medication, as described

2   in the records of Dr. Parks and Dr. Shaw, as corroboration for her opinion that Ms. Leonard's

3   mental impairment was not severe.  AR 91, 92.  However, the Administrative Record clearly states

4   that Ms. Leonard has a history of treatment with psychotropic medications to which she did not

5   respond well, specifically Paxil, Prozac and Wellbutrin.  AR 960.  Therefore, her unwillingness to

6   use psychotropic medications is not dispositive on the issue of Ms. Leonard's mental impairment.

7      In addition to her disregard of much of the administrative record, the ALJ did not question

8   Ms. Leonard about her mental health during her hearing.  AR 35-56.  Ms. Leonard's representative

9   warned the ALJ that Ms. Leonard suffered from mental impairment at least as significant as her

10  physical problems.  AR 35-36.  He warned that Ms. Leonard could be set off and that she spoke

11  slowly and rambled.  *Id.*  In light of these conditions, he requested a psychiatric evaluation.  *Id.*

12  The ALJ denied the request given the absence of findings that claimant suffered from a "severe"

13  mental impairment and that a current psychological examination would not suggest the presence

14  of a severe mental impairment on or before June 30, 2012.  AR 93-94.

15     The ALJ failed to meet her duty to develop Ms. Leonard's record.  The duty to develop the

16  record "is heightened when the claimant suffers from a medical impairment and therefore may not

17  be able to protect her own interests."  *Xie v. Colvin*, *supra,* 2015 U.S. Dist. LEXIS 125251, at \*49.

18  "The ALJ in a social security case has an independent 'duty to fully and fairly develop the record

19  and to assure that the claimant's interests are considered.'"  *Id.* (citing *Hilliard v. Barnhart,* 442 F.

20  Supp.2d 813, 817 (N.D. Cal. 2006); *Tonapetyan v. Halter,* 242 F.3d 1144, 1151 (9th Cir. 2001);

21  *Smolen v. Chatter,* 80 F.3d 1273, 1288 (9th Cir. 1996).  "The ALJ's duty to develop the record

22  fully is also heightened" in this type of situation.  *Id.*  (citing *Higbee v. Sullivan,* 975 F.2d 558, 562

23  (9th Cir. 1992)); *DeLorme v. Sullivan,* 924 F. 2d 841, 849 (9th Cir. 1991) ("In cases of mental

24  impairments this duty [to develop the record] is especially important.")  If the ALJ doubted the

25  severity of Ms. Leonard's mental condition, she should have ordered an evaluation to resolve the

26  doubt and provide a clear record.  Therefore, the Court finds that substantial evidence does not

27  support the  ALJ's findings regarding Ms. Leonard's mental disability.

28          **c.   The ALJ Erred in Rejecting Ms. Leonard's Credibility and by Distorting**

United States District Court
Northern District of California

14

1          **the Testimony.**

2          In addition to resolving conflicts in medical testimony and ambiguity, it is the ALJ's

3   responsibility to determine credibility.   *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).

4   However, the ALJ's findings must be supported by specific, cogent reasons.   *Rashad v. Sullivan,*

5   903 F.3d 1229, 1231 (9th Cir. 1990).   Here, the ALJ relied on Ms. Leonard's accounts that she "is

6   able perform some household chores, including cooking, washing the dishes and straightening the

7   house," is able "drive short distances, use public transportation and go shopping once a week,"

8   "patronizes an open produce every few weeks," and "attends a community support group once a

9   week."  AR 96.   Therefore, the ALJ determined that "claimant's daily activities undermine her

10  allegations that she has been unable to perform any work since July 28, 2009.  Moreover, there is

11  evidence of symptom exaggeration" in the form of "variable behavior" noted by Dr. Lewis during

12  her examination.  *Id.*

13         Once the claimant produces medical evidence of underlying impairment, the ALJ may not

14  discredit the claimant's testimony as to the severity of symptoms merely because they are

15  unsupported by objective medical evidence.  *Bunnell v. Sullivan,* 947 F. 2d 341, 343 (9th Cir.

16  1991).   To support a lack of credibility finding about a claimant's subjective pain complaints, an

17  ALJ must "point to specific facts which demonstrate that the claimant is in less pain that she

18  claims." *Vasquez v. Astrue,* 572 F.3d 586, 591-92 (9th Cir. 2009).   Where the ALJ does not find

19  that a claimant was malingering, the ALJ is required to specify the testimony that the ALJ finds

20  not credible and provide clear and convincing reasons supported by the record for rejecting the

21  claimant's subjective testimony. *Brown-Hunter v. Colving,* 806 F.3d 487, 492-93 (9th Cir. 2015).

22  General findings are insufficient; rather the ALJ must identify what testimony is not credible and

23  what evidence undermines the claimant's complaints. *Lester v. Chatter,* 81 F.3d 821, 834 (9th

24  Cir. 1996).

25         Here, the ALJ relied on the testimony that Ms. Leonard could straighten her home, shop or

26  go out once a week, but that evidence is inadequate to undercut Ms. Leonard's credibility.  The

27  ALJ did not fully cite or place Ms. Leonard's testimony in context.  Ms. Leonard's more complete

28  statements are that she was able to "prepare simple foods for myself," "do light household chores

United States District Court
Northern District of California

15

1    in small amounts as I feel up to it," and that she had to drive short distances because "I have

2    difficulty sitting…for long periods due to pain…I have a hard time twisting and turning…I feel

3    anxious and nervous when driving…" AR 232-233.  When shopping, Ms. Leonard stated:  "I get a

4    cart and lean on it for support." AR 233-35.  As to the occasional trips to the farmer's market, Ms.

5    Leonard said: "I buy lettuce or vegetables…I do not stay very long." AR 236.  Finally, as to her

6    weekly meetings, Ms. Leonard stated that "the meeting lasts three hours, but I only stay for about

7    one hour, as I have difficulty sitting for longer periods due to the pain in my back, tailbone, and

8    things." *Id.*

9         With regard to the purported "variable behavior" reported by Dr. Shaw, the Court fails to

10   find anything noteworthy or indicative of Ms. Leonard's lack of veracity in the ability to get on

11   and off an examination table with greater ease than sinking into a chair.  This episode and the fact

12   that Ms. Leonard attended to any of her needs is insufficient to discredit her testimony.

13        Moreover, courts have recognized that disability claimants should not be penalized for

14   attempting to lead normal lives in the face of their limitations.  *See, e.g., Cooper v. Bowen,* 815

15   F.2d 557, 561, 603 (9th Cir. 1989) (noting that a disability claimant need not "vegetate in a dark

16   room" in order to be deemed eligible for home benefits).  "Only if the activity were inconsistent

17   with claimant's claimed limitations would those activities have any bearing on claimant's

18   credibility." *Reddick v. Chatter,* 157 F.3d at 722.   The Court finds that the ALJ made no finding

19   of malingering, that the ALJ failed to provide a clear and convincing basis for rejecting Ms.

20   Leonard's testimony, and therefore, the ALJ should not have rejected Ms. Leonard's testimony on

21   these issues.

22                    **d.   The ALJ Improperly Disregarded The Opinions of Treating Physicians.**

23        Not only did the ALJ reject Ms. Leonard's testimony and fail to consider the reports

24   prepared by the therapists who counseled Ms. Leonard at Kaiser, the ALJ also failed to consider

25   the reports of the treating physicians Dr. Sobol and Dr. Hsieh.  An ALJ must consider all medical

26   opinion evidence.  20 C.F.R. § 404.1527(b).  The Ninth Circuit has "developed standards that

27   guide analysis of an ALJ's weighing of medical evidence." *Ryan v. Commissioner of Soc. Sec.,*

28   528 F.3d 1194, 1198 (9th Cir. 2008).  A reviewing court must distinguish between: (1) those who

United States District Court
Northern District of California

1   treat the claimant – the treating physicians; (2) those who examine but do not treat the claimant –

2   the examining physicians; and (3) those physicians who neither examine nor treat – the non-

3   examining physicians. *Lester v. Chatter,* 81 F.3d at 830.  Each opinion is given a different amount

4   of deference.  "The opinion of the treating physician is … entitled to greater weight than that of an

5   examining physician, the opinion of an examining physician is entitled to greater weight than that

6   of a non-examining physician." *Garrison v. Colvin,* 759 F.3d at 1012.  Treating physicians are

7   afforded greater weight because they are in a better position to know plaintiff as an individual and

8   because they know if the treatment improves the ability to understand and assess an individual's

9   medical concerns. *Embrey v. Bowen,* 849 F.2d 418, 421-22 (9th Cir. 1988).  Therefore, if a

10  treating physician's opinion is not contradicted by another doctor, it may be rejected for only

11  "clear and convincing reasons supported by substantial evidence." *Ryan v. Comm. Of Soc. Sec.,*

12  528 F.3d at 1198.

13          Treating physician Dr. Sobol repeatedly treated Ms. Leonard over the course of several

14  years.  Yet, the ALJ decided to give less weight to Dr. Sobol's findings of work capacity than

15  those of examining physician Dr. Lewis, "as they appear to have been based largely on claimant's

16  subjective complaints."  AR 96.  The ALJ gave "great weight to Dr. Lewis' opinion as she

17  performed a comprehensive examination of the claimant."  AR 96.

18          However, Dr. Sobol performed many physical examinations over the course of time and

19  also reviewed Ms. Leonard's medical records.  AR 1298-1270.  Like Dr. Lewis, Dr. Sobol

20  performed extension and range of move tests, e.g., extension exam, Tinel's test, Finkelstein's test,

21  range of motion (AR 1299), leg raises, Fabere's test, Spurling's maneuver, and MRI review (AR

22  1300).  The ALJ's determination that Dr. Sobol's findings were based on largely on claimant's

23  subjective complaints is contrary to the content of Dr. Sobol's reports and, as noted above, and fail

24  to take into consideration Ms. Leonard's statements.  The ALJ improperly disregarded Dr. Sobol's

25  findings and placed greater importance on the observations of Dr. Lewis.

26          Similarly, the ALJ rejected the opinions of treating physician Dr. Hsieh and gave more

27  weight to Dr. Lewis's opinion.  AR 96.  The ALJ found that Dr. Hsieh's opinion that Ms. Leonard

28  could only lift more than five pounds occasionally lacked "significant positive objective findings."

United States District Court
Northern District of California

17

1    *Id.* The ALJ provided no basis for rejecting the remainder of Dr. Hsieh's findings, such as Ms.

2    Leonard's fatigue that resulted from Ms. Leonard's thyroid dysfunction, Ms. Leonard's chronic

3    pain, and the limitations on Ms. Leonard's attention and concentration. AR 1602-04. Dr. Lewis

4    did not address Ms. Leonard's thyroid issues.

5                    **e.   The ALJ Failed to Analyze Ms. Leonard's Impairments in Combination
                         with Each Other.**

6            The social security statutes explain that a claimant may be disabled by an impairment or by

7    a combination of impairments. The ALJ is also "required to consider all of the limitations

8    imposed by the claimant's impairments, even those that are not severe," because in combination

9    with other impairments, non-severe limitations may contribute to rendering a claimant disabled."

10   *Case v. Astrue,* 425 Fed. Appx. 565, 567 (9th Cir. 2005). For example, while obesity is no longer

11   a listed impairment, ALJ's are required to consider the combined effect of obesity with other

12   impairments when determining a claimant's ability to work. *Glass v. Barnhart,* 163 Fed. Appx

13   470, 471 (9th Cir. 2006).

14           In the present matter, there is no indication that the ALJ evaluated the combined effects of

15   all of the claimant's impairments – physical and mental. Therefore, the Court remands this matter

16   for such evaluation to be performed in accord with the requirements discussed above, and based

17   on all of the evidence in the administrative record.

18                    **f.   Remand is Necessary.**

19           The Court has discretion to remand or reverse and award benefits. *McAllister v. Sullivan,*

20   888 F.2d 599, 603 (9th Cir. 1989). "[W]here the record has been developed fully and further

21   administrative proceedings would serve no useful purpose, the district court should remand for an

22   immediate award of benefits." *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004). However,

23   where there are outstanding issues that must be resolved before a final determination can be made,

24   and it is not clear from the record that Plaintiff is disabled, remand is appropriate. *Id.* at 593-96.

25           As described above, there are outstanding issues in the present matter that must be resolved

26   before a final disability determination can be made. The following is the scope of the remand

27   proceedings: (1) the ALJ shall incorporate the testimony of Ms. Leonard and provide greater

28   weight to the opinions of her treating physicians than non-treating physicians in the determination

United States District Court
Northern District of California

1   of Ms. Leonard's RFC and will first apply the relevant legal standard to determine discounting an

2   opinion; (2) the ALJ shall develop Ms. Leonard's evidentiary record as it relates to her mental

3   capacity, specifically obtaining a medical evaluation or consultative exam, as well as including the

4   records of her psychotherapists from Kaiser, in the evaluation of the severity of Ms. Leonard's

5   condition and her RFC; (3) the ALJ shall reassess Ms. Leonard's RFC in light of all of Ms.

6   Leonard's physical and mental impairments as a whole; and (4) the ALJ shall revisit her analysis

7   at steps four and five based on the newly assessed RFC.

      C.  **CONCLUSION**

9         For the foregoing reasons, Ms. Leonard's motion is GRANTED and the Commissioner's

10  motion is DENIED.  The action is REMANDED for further administrative proceedings consistent

11  with this opinion.

12        **IT IS SO ORDERED**.

13  Dated: March 17, 2016

14  _____

15  SALLIE KIM
    United States Magistrate Judge

*United States District Court*
*Northern District of California*